Michelle R. Press
SBN 163637
**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, California 90071
Telephone: (213) 443-5100
Facsimile: (213) 443-5101
Michelle.Press@wilsonelser.com

Chad C. Butterfield *(pro hac vice to be filed)*
Nevada Bar No. 10532
**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**
6689 Las Vegas Blvd. South, Suite 200
Las Vegas, NV 89119
Telephone: (702) 727.1400
Facsimile: (702) 727-1401
Chad.Butterfield@wilsonelser.com

*Attorneys for Plaintiff
Antares Reinsurance Company Limited*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTARES REINSURANCE COMPANY LIMITED, a Bermudian company,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL TRANSPORTATION ASSOCIATES, INC. d/b/a NTA GENERAL INSURANCE AGENCY, a California corporation; and SUPERIOR RISK MANAGEMENT, INC., a California corporation,<br><br>Defendants. | CASE NO. 3:23-cv-00113<br><br>**COMPLAINT AGAINST NATIONAL TRANSPORTATION ASSOCIATES, INC. AND SUPERIOR RISK MANAGEMENT, INC. FOR:**<br><br>**(1) BREACH OF CONTRACT – SPECIFIC PERFORMANCE;**<br><br>**(2) BREACH OF CONTRACT – REIMBURSEMENT;**<br><br>**(3) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>**(4) BREACH OF FIDUCIARY DUTY** |

(5) **DEMAND FOR ACCOUNTING**
(6) **FRAUDULENT MISREPRESENTATION;**
(7) **FRAUD; AND**
(8) **DECLARATORY RELIEF**

COMES NOW, Plaintiff Antares Reinsurance Company Limited, formerly known as Qatar Reinsurance Company Limited ("Antares" or "Plaintiff"), and alleges as follows:

## PARTIES

1.      Plaintiff is a corporation organized and existing under the laws of Bermuda.

2.      Defendant National Transportation Associates, Inc. d/b/a NTA General Insurance Agency ("NTA") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Pleasanton, California. NTA is, and at all times relevant to this complaint was, a citizen of the State of California.

3.      Defendant Superior Risk Management, Inc. ("SRM") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Pleasanton, California. SRM is, and at all times relevant to this complaint was, a citizen of the State of California.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction under 28 U.S.C. section 1332 because Antares and NTA are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      Venue is proper in this judicial district because NTA and SRM are subject to this Court's personal jurisdiction with respect to this instant action. SRM and NTA maintained their principal places of business in Pleasanton, California, during the pendency of the acts and omissions giving rise to the claims asserted

herein.

## FACTUAL ALLEGATIONS

### The Relationship between Antares and NTA

6.      Non-party United Specialty Insurance Company ("USIC") is an insurance company that offers policies of insurance for commercial automobile liability, among other things.

7.      NTA is a General Agent that provides underwriting services, claims handling, and insurance products on behalf of Antares, including for commercial transportation trucking businesses.

8.      SRM provides claims management services specializing in transportation, including commercial trucking, buses, and trains. SRM holds itself out to manage all phases of claims administration, including claim investigation, claim adjustment, claim negotiation and litigation management.

9.      USIC and other affiliates and parties entered into a General Agency Agreement (sometimes referred to as "GAA"), a Quota Share Reinsurance Agreement ("Quota Share Agreement") and various Interests and Liabilities Contracts with NTA effective May 1, 2017 (collectively "the Agreements").

10.      Antares and other subscribing reinsurers are parties to the GAA and Quota Share Agreement.  Antares also entered into an Interests and Liabilities contract with USIC (and its affiliates) and NTA.

### The General Agency Agreement

11.      Under the General Agency Agreement, NTA agreed to perform all functions necessary for the production, service and management of policies issued on behalf of USIC and its affiliates, subject to the Quota Share Agreement in accordance with the terms and conditions set forth therein and in the GAA.

12.      USIC's appointment of NTA as its General Agent, at the request of Antares and the other subscribing reinsurers, is memorialized in Section 1.01 of the GAA, as follows:

> [USIC], at the request of the Reinsurer, hereby appoints the General Agent as its general agent for the purpose of producing and handling the business which is the subject of the Reinsurance Agreement issued or renewed on or after the effective date of this Agreement. [USIC] hereby grants authority to the General Agent to solicit, accept and receive applications for such classes of coverage as are specified in the Reinsurance Agreement; to secure, at its own expense, reasonable underwriting information through reporting agencies or other appropriate sources relating to each risk insured; to issue, renew and countersign policies, certificates, endorsements and binders which the Company may, from time to time, authorize to be issued, delivered, renewed and countersigned; and to collect and receipt for the premiums thereon and therefor.

13.    Section 1.03 of the General Agency Agreement requires NTA, at the request of Antares and the other subscribing reinsurers, to perform all acts and duties required under the policies of insurance issued on behalf of USIC and its affiliates, and provides, in pertinent part, as follows:

> [USIC] further authorizes [NTA] to perform all acts and duties under policies of insurance issued by [USIC] as would otherwise be performed by [USIC], including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to [USIC], and adjusting and paying losses or other claims. The Company grants to [NTA] the authority to settle claims on behalf of [USIC]. . . . [USIC] retains final authority to determine any disputes relating to claims settlement and setting of loss reserves. . . While there are acts of [NTA] which may be required by applicable law to be performed on behalf of [USIC], **[NTA] shall** remain ultimately responsible for such acts and will **indemnify and hold the Company completely harmless** for any damage, cost, liability, expense and/or loss (including attorneys' fees and expenses) incurred by [USIC] as respects such acts of [NTA]. [NTA] must send [USIC] a report, as soon as it becomes known, that a claim (i) involves

a coverage dispute; (ii) involves a demand in excess of policy limits; (iii) alleges bad faith; (iv) is open for more than six months; or (v) alleges a violation of any applicable unfair practices and unfair competition statutes. [USIC] may suspend or terminate the settlement authority of [NTA] during the pendency of any dispute regarding any event of default by [NTA]. (Emphasis added.)

14.    Pursuant to Section 1.04 of the GAA, NTA was "authorized to have claims adjusted through **independent** claims adjusters." (Emphasis added.) Section 1.04 provides that such independent claims adjusters retained by NTA "are not the agents of [USIC] and [USIC] shall be held harmless and indemnified by [NTA] for any liability, claim, demand, expense, and/or cost of whatever kind or character as a result of, related to or connected with any action or inaction of such claims adjusters."

15.    Section 2.01 of the GAA requires NTA to deposit all premiums it collects on the business produced under the Quota Share Agreement in a premium trust account, and expressly provides that the funds therein are owned by USIC:

All premiums collected by the General Agent [NTA] on the business produced under the [Quota Share Agreement] shall be deposited in a premium trust account.  Despite the General Agent's ownership of the account, funds deposited therein on behalf of [USIC]  are understood to be owned by [USIC] and the account shall be maintained by the General Agent in a **fiduciary capacity** separate and apart from any operating or other funds of the General Agent and furthermore shall be separate and apart from any other funds maintained by the General Agent on behalf of any other entity or person. The only disbursements from such account shall be the payment of claims, claim expenses, return premiums, commission due the General Agent as authorized herein and in the [Quota Share Agreement], and remittance of premiums to [USIC] …. (Emphasis added.)

16.    Section 2.05 of the GAA requires NTA to "remit to [the subscribing reinsurer(s) or USIC] as applicable, any funds of or due to [USIC] under [the GAA]

within forty-five (45) days from the end of the month in which the premium is recorded.

17.    Section 2.06 of the GAA provides that, "[NTA] shall hold all funds of or due [USIC] in a fiduciary capacity."

18.    Section 5.01 of the GAA provides that, NTA "shall, at all times during the period of this Agreement, comply with all applicable laws and all orders, policy decisions or other requirements of the Texas Department of Insurance or other applicable state insurance department," which includes California Department of Insurance Code Section 790.03(h)(5) and Regulations, Title 10 Section 2695.7(d) and (g).

19.    Section 5.02 of the GAA requires NTA to make its books, records, accounts, documents, and correspondence pertaining to USIC's and the subscribing reinsurers' business **open to examination by any authorized representative of USIC or the subscribing reinsurer(s) at all times**:

> All books, records, accounts, documents and correspondence of [NTA] and any producing agent pertaining to [USIC's and the subscribing reinsurers'] business shall, at all times, be open to examination by any authorized representative of [USIC or the subscribing reinsurer(s)]. [NTA] shall make copies of records available upon request by [USIC or the subscribing reinsurer(s)], whether such request is before or after termination of this Agreement or the Reinsurance Agreement. [NTA] must maintain separate records of business, including, but not limited to, underwriting files for each insurer for whom it acts as a general agent. Such records must be maintained for five (5) years or until the completion of a financial examination by the insurance department of the state in which [USIC] is domiciled, whichever is longer.

20.    Section 5.05 of the GAA requires NTA to account for and furnish, upon request with reasonable notice, complete copies of all policies issued, and copies of all claim files, as follows:

> [NTA] shall account for and furnish to [USIC], upon request with reasonable notice, complete copies of all policies issued, copies of all spoiled, voided or otherwise unissued policies, and copies of all claim files created with respect to all loss occurrences under any policy issued under this Agreement.

21.     Section 5.06 of the GAA requires NTA to provide, upon request, electronic copies of any and all data related to the reinsured business:

> Upon request of [USIC], prior to or after the termination of this Agreement, [NTA] shall provide to [USIC], at [NTA's] sole cost and expense, electronic copies of any and all data related to the reinsured business in a format specified by [USIC]. Further, [NTA] shall ensure any vendor or other third party acknowledges and agrees [USIC], at no expense to [USIC], shall have use of any systems, data, information, reports, files or statistics prior to or after the termination of this Agreement.

22.     Section 5.08 of the GAA requires NTA to provide USIC with data from all electronic claim files within thirty (30) days or less if requested by USIC.

23.     Section 9.08 of the GAA provides that, in the event the amount of any claim or counterclaim against NTA is in excess of five hundred thousand ($500,000), including in such calculation all amounts of compensatory and punitive damages, such claim or counterclaim shall not be subject to arbitration, and litigation shall be the sole remedy for any such claim. Antares' claim against NTA is well in excess of $500,000; thus, pursuant to Section 9.08 of the GAA, Antares hereby elects to pursue litigation against NTA in this Court.

### The Quota Share Agreement

24.     The Quota Share Agreement provides that NTA is appointed as the general agent for the purpose of producing and handling the business that is the subject of the contract.

25.    Section 1.03 of the Quota Share Agreement states in relevant part as follows:

> [USIC] further authorizes the General Agent to perform all acts and duties under policies of insurance issued by [USIC] as would otherwise be performed by [USIC], including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to [USIC], and adjusting and paying losses or other claims. The Company grants to the General Agent the authority to settle claims on behalf of [USIC].

26.    Sections 1.03 and 5.02 of the Quota Share Agreement further define NTA's delegated authority and duties:

> [USIC] has appointed [NTA] as its general agent for the purpose of producing and handling the business which is the subject of this Contract. . . . [USIC] has further authorized [NTA] to perform all acts and duties. . . as would otherwise be performed by [USIC], including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to [USIC], and adjusting and paying losses or other claims. [USIC] has granted to [NTA] the authority to settle claims on behalf of [USIC]. . . .

27.    Section 5.03 of the Quota Share Agreement empowers NTA "to accept notice of and investigate any claim arising under any of the Policies, to pay, adjust, settle, resist or compromise any such claim, unless [USIC] specifically directs to the contrary with respect to any individual claim" and requires NTA to "exercise the authority granted [t]hereunder in good faith and toward the end of paying any and all valid claims."

28.    Section 5.04 of the Quota Share Agreement **requires NTA to make available to [USIC and Antares] all records pertaining to claims** arising under insurance policies subject to the Quota Share Agreement, as follows:

ANTARES REINSURANCE COMPANY'S COMPLAINT
278906177V.1

Case No. 3:23-cv-00113

All records pertaining to claims arising under insurance policies issued on behalf of [USIC] through or by the General Agent subject to this Agreement shall be deemed to be **jointly owned records of [USIC] and the Reinsurer**, and shall be made available to [USIC and the subscribing reinsurer(s)] or their respective representatives or any duly appointed examiner for any state within the United States; and these records shall be kept in the State of California or such other jurisdiction as may be required by applicable state law or regulation. (Emphasis added.)

29.    Pursuant to Section 5.05 of the Quota Share Agreement, NTA is required to establish and maintain a claim register in a manner that allows the determination of the status of any claim arising out of any policies issued under the Agreements:

[NTA] shall establish a separate claim register or method of recording claims arising under the Policies covered by this Agreement so that all claims may be segregated and identified separate and apart from other records of the Reinsurer or [NTA], with such claims register **to identify each claim on an individual case basis both as to identify the insured(s) and the claimant, the reserve for loss and adjusting expense**. Such claim register shall be kept in a manner whereby [USIC] can, at any time, determine the status of any claim arising under Policies covered by this Agreement. Such records shall reflect the amount of reserves established for the individual claim and the date when such reserve was established, and if closed, whether such claim was closed with or without payment, and if with payment, the amount paid thereon. (Emphasis added.)

30.    Section 6.04 of the Quota Share Agreement **requires** NTA to advise USIC and Antares of claims that fall within the following categories:

1.    Are reserved for an amount in excess of $100,000;

2.    Originate from the following kinds of bodily injury:

a. Brain injuries resulting in impairment of physical function;

b. Spinal injuries resulting in a partial or total paralysis of upper or lower extremities;

c. Amputation or permanent loss of use of upper or lower extremities;

d. Severe burn injuries;

e. Loss of sight in one or both eyes;

f. All other injuries likely to result in a permanent disability rate of 50% or more; and

g. Fatalities.

31.     Section 8.05 of the Quota Share Agreement governs NTA's commission structure, and provides that the provisional commission allowed to NTA shall be calculated, adjusted and applied to the ceded premiums earned for each agreement year in accordance with the provisions set forth below:

(i)     If the ratio of losses incurred to premiums earned is 66% or greater, the adjusted commission rate for the period under consideration shall be 25%.

(ii)    If the ratio of losses incurred to premiums earned is less than 66%, but not less than 57%, the adjusted commission rate for the period under consideration shall be 25%, plus 100% of the difference in percentage points between 66% and the actual ratio of losses incurred to premiums earned.

(iii)   If the ratio of losses incurred to premiums earned is less than 57%, but not less than 45% the adjusted commission rate for the agreement year under consideration shall be 34% plus 50% of the difference in percentage points between 57% and the actual ratio of losses incurred to premiums earned up to a maximum commission of 40% at a loss ratio of 45%.

32.     Section 8.05 of the Quota Share Agreement provides additional detail as to the priovisional commission:

> If the ratio of losses incurred to premiums earned for any period is greater than 66%, the difference in percentage points between the actual ratio or losses incurred to premiums earned and 66% shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a debit (additional) to losses incurred. If the ratio of losses incurred to premiums earned for any period is less than 45%, the difference in percentage points between 45% and the actual ratio of losses incurred to premiums earned shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a credit to losses incurred. Such credits/deficits shall not carry forward for more than two (2) years.

33.     Section 8.05 of the Quota Share Agreement provides NTA with additional requirements as to the provisional commissions:

> The General Agent shall calculate and report the adjusted commission on ceded premiums earned within 60 days after 24 months after the end of each agreement year, and within 60 days after the end of each 12-month period thereafter until all losses subject hereto have been fully settled. If the adjusted commission on ceded premiums earned is less than commissions previously allowed by the Reinsurer on ceded premiums earned for the agreement year, **the General Agent shall remit the difference to [the subscribing reinsurers]** with its report.… (Emphasis added.)

34.     Section 8.05 of the Quota Share Agreement provides that NTA must remit provisional commissions following the final adjustment period:

> As respects the final adjustment period, the General Agent shall calculate and report the adjusted commission on premiums earned within ninety (90) days after the date of termination, and within ninety (90) days after the end of each twelve (12) month period thereafter until all losses subject

hereto have been finally settled.  Each such calculation shall be based on cumulative transactions hereunder from the beginning of the final adjustment period through the date of adjustment. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is less than commissions previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report.…

35.    Section 8.05 of the Quota Share Agreement defines "losses incurred" as the balance of the following:

(i)    Ceded losses and loss adjustment expenses paid as of the effective date of calculation; plus

(ii)   The ceded reserves for losses and loss adjustment expenses outstanding as of the effective date of calculation;

(iii)  Plus (minus) the debit (credit) from the preceding agreement year as set forth in paragraph (b) above except that such credits/deficits shall not carryforward more than two (2) years; plus

(iv)   Any assignments and/or assessments as set forth in Section XI of the [Quota Share] Agreement.

36.    Article IX of the Quota Share Agreement provides that, "[Antares] or its duly appointed **representatives shall have free access at any and all reasonable times to such books and records of the** General Agent, and its departmental or branch offices as shall reflect premium and loss transactions of [USIC] and/or the business produced hereunder, for the purpose of obtaining any and all information concerning [the Quota Share] Agreement or the subject matter hereof." (Emphasis added.)

37.    For the 2017 agreement year, NTA received a provisional commission of 31% of premiums earned.

38.    For the 2018 agreement year, NTA received a provisional commission of 32% of premiums earned.

39.    For the 2019 agreement year, NTA received a provisional commission of 31% of premiums earned.

40.    Section 18.06 of the Quota Share Agreement provides that, "[w]here [NTA] retains claims handling authority, [NTA] warrants that it will assess and administer claims in a reasonable, good-faith and business-like manner, acting always in accordance with statutory laws and regulations."

### The Interests and Liabilities Contracts

41.    The executed signatures on behalf of USIC and its affiliates, NTA, and Antares binding the parties to the GAA and Quota Share Agreement appear on the Interests and Liabilities Contracts attached to the GAA and Quota Share Agreement.

### The Claims Adjusting Agreement

42.    Pursuant to authority conveyed to NTA under Section 1.04 of the GAA, effective May 1, 2017, NTA entered an Agreement for Claims Administration and Adjusting Services ("Claims Adjusting Agreement") with SRM to allow SRM to act on behalf of NTA in the management, investigation, adjustment of claims, and management of litigation against USIC insureds, and the settlement of claims within USIC policy limits.

43.    Antares is informed and believes that SRM and NTA are affiliates that share common ownership and management, and NTA did not disclose this relationship to Antares prior to initially entering into the Agreements.

44.    Pursuant to the Claims Adjusting Agreement and applicable law, SRM had the duty and responsibility to diligently manage, investigate, adjust and settle all claims on behalf of USIC in compliance with all policies, applicable laws and SRM's Claims Handling Guidelines. The duties and responsibilities of SRM under the Claims Adjusting Agreement and the Claims Handling Guidelines include the following obligations, among others:

a. Record, establish and adequately maintain a file for the claim (Sections III.A. and B.1; Claims Handling Guidelines Chs. 1, 4, and 5.)

b. Establish and maintain appropriate reserves for the claim based on a continuing claim investigation and evaluation (Section III.B.3; Claims Handling Guidelines Chs. 1, 2, 4 and 5.)

c. Provide adequate management control to ensure ongoing implementation of the reserve review process (Section III.B.4; Claims Handling Guidelines Ch. 2.)

d. Advise upon receipt of any claim over $100,000 or claims involving brain injuries (Section III.B.6-8; Claims Handling Guidelines Chs. 2, 4-5.)

e. Advise of any plaintiff's settlement demand in excess of policy limits or any alleged bad faith.

f. Independently manage assigned defense counsel.

g. Attend all court-mandated hearings and settlement conferences.

h. Pay, adjust, settle, resist or compromise any claim arising under any of the policies issued pursuant to the Agreements in good faith and toward the end of paying any and all valid claims.

i. Comply with all applicable laws and all orders, policy decisions or other requirements of applicable state insurance departments including but not limited to California Department of Insurance Code Section 790.03(h)(5) and Regulations, Title 10 Section 2695.7(d) and (g).

## **NTA and SRM's Repeated Refusal to Permit Inspection**

45. Antares made numerous requests to inspect and make copies of NTA's "books, records, accounts, documents and correspondence." NTA and SRM have

refused to provide the requested documents, and have failed and refused to make the requested documents available for inspection and copying.

46.     Antares similarly requested, on numerous occasions, access to "[a]ll records pertaining to claims arising under insurance policies issued on behalf of [Antares] through or by [NTA] subject to [the Quota Share] Agreement." NTA has failed and refused to make the requested documents available for inspection and copying.

47.     Antares made requests for electronic copies of data related to the reinsured business. NTA has failed and refused to provide electronic copies of claims files and other data requested.

**NTA's and SRM's Fraudulent Scheme to Manipulate "Losses Incurred"**

48.     On information and belief, NTA and SRM have engaged in a fraudulent scheme to manipulate "losses incurred" in order to avoid triggering the reductions to NTA's provisional commissions as provided in Section 8.05 of the Quota Share Agreement.

49.     On information and belief, NTA and SRM carried out their fraudulent scheme by intentionally under-reserving losses and loss adjustment expenses, both of which are included within the definition of "losses incurred" under Section 8.05 of the Quota Share Agreement.

50.     On information and belief, rather than pay claims indisputably owed, NTA and SRM under-reserved the claims and incurred relatively significant amounts to defend the claims rather than appropriately reserve and pay the claims.

51.     NTA also failed to appropriately acknowledge large payments in order to avoid triggering the reductions to NTA's provisional commissions.

52.     On information and belief, by under-reserving losses and loss adjustment expenses, and by failing to appropriately record large payments of the Reinsurer, NTA and SRM have fraudulently increased the ratio of losses incurred to

premiums earned. NTA has profited from this scheme by receiving artificially inflated provisional commissions.

53.    As an example, NTA and SRM were aware that a lawsuit entitled *Cuevas, et al. v. Rai Transport, et al.*, Superior Court of California, County of Kern, Metropolitan Division under Case No. BCV-18-100615-SDS (the "Cuevas Action") involved allegations of traumatic brain injuries. Nonetheless, SRM assigned indemnity reserves of $3.00 each for the three plaintiffs, for a total indemnity reserve of $9.00.

54.    During the course of the Cuevas Action, SRM sent various large loss reports to NTA and NTA's Intermediary identified in the Quota Share Agreement, which omitted, and/or misrepresented information that NTA was required to provide under the Agreements. Large loss reports are completed by Gary Glenn of SRM, and forwarded to Yogesh Kumar, the principal of both SRM and NTA, for review. The Large Loss Reports either misrepresented the nature of the injuries or omitted critical factual information, such as the fact plaintiffs had made policy limits demands (two of them), which SRM had rejected.

55.    Trial of the Cuevas Action commenced in in late November 2019. NTA and SRM failed to notify USIC and/or Antares that they had authorized a stipulation to liability and failed to notify USIC and/or Antares of the commencement of trial, and then failed to monitor, request and receive daily reports from counsel as required by SRM's Litigation Management Guidelines. Trial resulted in a verdict of $70,578,289.00 rendered against Rai that the trial court later reduced to a Second Amended Judgment on Special Verdict in the amount of $67,275,370.66 (the "Cuevas Verdict").

56.    Antares' first notice of the outcome of the Cuevas Action trial and the assertion by the Cuevas Plaintiffs that Antares and the other subscribing reinsurers would be responsible for the Cuevas Verdict was not until after the jury in the Cuevas Action rendered its verdict.

57.    Even though the policy was subject to a "per accident" single liability limit of $1 million, the Cuevas Plaintiffs claimed that USIC, through Antares and the other subscribing reinsurers, was obligated to pay the entire Judgment, post-judgment interest accruing in the amount of $6,727,537 per year, and an unspecified amount for punitive damages due to the alleged bad faith failure to accept a policy limit demand on behalf of the insureds.

58.    On or about November 13, 2020, after making demands that NTA and SRM settle the Cuevas Action, USIC settled the all pending litigation with the Cuevas Plaintiffs for a confidential amount funded entirely by Antares and the other subscribing reinsurers well in excess of the jurisdictional limit of this Court.[1] NTA refused to acknowledge that the settlement was part of the program and refused to consider it in calculating the loss ratio.

### NTA's Refusal to Return Commissions on Ceded Premiums

59.    The settlement of the Cuevas Action is a "loss incurred" under the 2017 year of the Agreements. The settlement of the Cuevas Action has significantly altered NTA's ratio of losses incurred to premiums earned, such that NTA's provisional commission of 31% was required to be adjusted downward to 25%.

60.    Moreover, pursuant to the loss deficit carryforward provisions of Section 8.05 of the Quota Share Agreement, NTA's 2018 provisional commission of 32% was required to be  adjusted downward to 21%, and its 2019 provisional commission of 31% was required to be adjusted downward to 24%. Section 8.05 of the Quota Share Agreement requires NTA to remit to the Reinsurer the difference between the provisional commissions and the adjusted commissions.  Based on the adjustments referenced above, NTA is required to remit more than $8,000,000.  Antares has made demands that NTA remit that amount, but NTA has refused to do, in violation of the

---

[1] The terms of the settlement with the Cuevas Plaintiffs are confidential, however, the fully executed settlement agreement and release memorializing the terms of settlement have previously been provided to SRM and NTA and can be lodged with the Court conditionally under seal at the appropriate time if necessary.

ANTARES REINSURANCE COMPANY'S COMPLAINT                                    Case No. 3:23-cv-00113
278906177V.1

1   Quota Share Agreement.

2   **NTA's and SRM's Fraudulent Use of A Fabricated Claimant**

3   **And Claim Number to Conceal Information From Antares**

4   61.    Beginning in or around March 2020, NTA and/or SRM began reporting

5   a liability claim to Antares and other reinsurers allegedly involving "John Smith

6   Trucking," identified as claim number H32445 ("the John Smith Trucking Claim").

7   62.    From March 2020 to the present, NTA and/or SRM has submitted

8   expenses under the John Smith Trucking Claim to Antares and the other reinsurers

9   for payment and/or reimbursement.

10   63.    From March 2020 to the present, Antares and the other reinsurers have

11   paid to NTA and/or SRM at least $760,047.24 for expenses allegedly incurred in the

12   John Smith Trucking Claim.

13   64.    On information and belief, John Smith Trucking is a non-existent entity

14   for whom NTA did <u>not</u> produce a policy of insurance on behalf of USIC and its

15   affiliates.

16   65.    In or around October 2022, Antares discovered that NTA and/or SRM

17   had set up the John Smith Trucking Claim as a "companion file" to the claim that

18   NTA and/or SRM had set up for Rai Transport, Inc. in the Cuevas Action (the "Rai

19   Transport Claim").

20   66.    Antares has also discovered that NTA and/or SRM used the John Smith

21   Trucking Claim to fraudulently conceal unfavorable information, facts and/or

22   evidence about the Cuevas Action from the reinsurers with respect to NTA's and/or

23   SRM's underwriting of the policy issued to Rai Transport, Inc., the handling of the

24   Rai Transport Claim, among others.

25   67.    Additionally, NTA and/or SRM utilized the John Smith Trucking Claim

26   to submit for payment or reimbursement from Antares and the reinsurers invoices

27   generated by NTA's and SRM's defense counsel in pending litigation USIC is

28   pursuing against NTA and SRM related to the Cuevas Action. Antares and the other

reinsurers have made payments for these invoices totaling at least $105,000.

## FIRST CAUSE OF ACTION

### Breach of Contract – Specific Performance

### (Against NTA and SRM)

68.    Antares refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

69.    The General Agency Agreement and Quota Share Agreement are valid and existing contracts.

70.    NTA has breached the General Agency Agreement and the Quota Share Agreement, including by repeatedly failing and refusing to allow examination of NTA's books, records, accounts, documents, correspondence, policies issued, spoiled, voided or otherwise unissued policies, claim files, and underwriting files, in violation of the express requirements set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement.

71.    Antares has complied with its obligations under the General Agency Agreement and the Quota Share Agreement.

72.    Antares has no other adequate remedy at law. Accordingly, Antares seeks specific performance of the requirements set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement.

73.    Antares is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

///

///

///

///

## **SECOND CAUSE OF ACTION**

### **Breach of Contract - Reimbursement**

### **(Antares v. NTA)**

74.    Antares refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

75.    NTA received provisional commissions under the Quota Share Agreement of 31%, 32% and 31% for agreement years 2017, 2018, and 2019, respectively.

76.    Following the settlement of the Cuevas Action, which fell under the 2017 agreement year, NTA's provisional commissions were required to be adjusted downward to 25% for 2017, 21% for 2018, and 24% for 2019.

77.    NTA is required under Section 8.05 of the Quota Share Agreement to remit to the Reinsurer the difference between the provisional commissions and the adjusted commissions. For agreement years 2017 through 2019, NTA's adjusted commissions are more than $8,000,000 less than its provisional commissions with respect to Antares.

78.     NTA has failed and refused to remit the amounts owed in breach of Section 8.05 of the Quota Share Agreement.

79.    As a direct and proximate result of NTA's breaches of Section 8.05 of the Quota Share Agreement, Antares has sustained, and will continue to sustain, damages in an amount to be proven at trial.

80.    Antares is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

///

///

///

### THIRD CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Antares v. NTA)

81.    Antares refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

82.    Implied in the Agreements is a covenant that NTA would not do anything that would unfairly deprive Antares of the benefits of the Agreements, and that NTA would perform its obligations under the Agreements in such a manner as to ensure that the purpose of the Agreements were accomplished in good faith.

83.    NTA has violated the implied covenant through its conduct set forth herein, including, without limitation, by engaging in a scheme to manipulate "loss amounts" to artificially inflate its provisional commissions under the Quota Share Agreement, by refusing to permit Antares with access to documents and records, and by refusing to remit amounts owed pursuant to Section 8.05 of the Quota Share Agreement.

84.    As a direct and proximate result of NTA's breach of the implied covenant of good faith and fair dealing under the Agreements, Antares has sustained and will continue to sustain damage in an amount to be proven at trial.

85.    NTA's conduct was intentional and the product of fraud, malice or oppression, thereby entitling Antares to an award of punitive damages.

86.    Antares is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

///

///

///

///

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Antares v. NTA)

87.    Antares refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

88.    NTA owes a fiduciary duty to Antares under the General Agency Agreement and the Quota Share Agreement.

89.    NTA has breached its fiduciary duty to Antares by repeatedly failing and refusing to allow examination of NTA's books, records, accounts, documents, correspondence, policies issued, spoiled, voided or otherwise unissued policies, claim files, and underwriting files, as required under Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement.

90.    Antares has been injured as a direct result of NTA's breach of its fiduciary duties. Alternatively, NTA has benefitted from its breach of fiduciary duties.

91.    Antares' injuries are incapable of compensation in damages. Accordingly, Antares seeks a mandatory injunction requiring NTA to comply with the requirements set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement.

92.    Antares is entitled to attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

## FIFTH CAUSE OF ACTION

### Demand for Accounting

### (Antares v. NTA)

93.    Antares refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

94.     On information and belief, NTA has failed to maintain a premium trust account under the terms set forth in Section 2.01 of the General Agency Agreement, including by failing to maintain the funds deposited into the premium trust account separate and apart from any operating or other funds of NTA, separate and apart from NTA's operating or other funds, and/or by making personal use of funds in the premium trust account.

95.     NTA has repeatedly failed and refused to provide Antares with information and records pertaining to the premium trust account and Antares' funds therein.  An accounting is therefore necessary as the information necessary to determine whether NTA has complied with its obligations under Section 2.01 of the General Agency Agreement is within the exclusive knowledge of NTA.

96.     Antares is entitled to attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

## SIXTH CAUSE OF ACTION

### Fraudulent Misrepresentation

### (Antares v. NTA and SRM)

97.     Antares refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

98.     By artificially manipulating loss amounts, NTA and SRM have made numerous material misrepresentations to Antares. Specifically, NTA and SRM have significantly under-reserved claims involving serious injuries, including traumatic brain injuries, in order to create a more favorable ratio of losses incurred to premiums earned.

99.     NTA and SRM had knowledge of the falsity of their misrepresentations. In the case of the Cuevas Plaintiffs, SRM was aware as early as April 13, 2018 that the Cuevas Action involved allegations of traumatic brain injuries. Less than two

months later, SRM assigned indemnity reserves of $3.00 for each of the Cuevas Plaintiffs, for a total indemnity reserve of $9.00. SRM did not adjust the indemnity reserves until more than a year later, on September 9, 2019, to a total of $160,000, which was still woefully inadequate.

100.   SRM and NTA also knowingly failed to disclose material information in large loss reports, including that the Cuevas Plaintiffs had made settlement demands that SRM and NTA unilaterally rejected. Large loss reports are prepared by SRM and reviewed by Yogesh Kumar, the principal of both SRM and NTA.

101.   SRM and NTA intended to induce Antares to rely on their misrepresentations, in order to receive higher provisional commissions under the Quota Share Agreement than NTA was actually owed.

102.   Antares justifiably relied on SRM's and NTA's misrepresentations and has been damaged as a result thereof. Moreover, Antares seeks an award of punitive damages as a result of SRM's and NTA's fraud.

103.   Antares is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

**SEVENTH CAUSE OF ACTION**

**Fraud**

**(Antares v. NTA and SRM)**

104.   Antares refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

105.   NTA and/or SRM has made material misrepresentations to Antares through its creation and use of the John Smith Trucking Claim as a "companion file" to the Rai Transport Claim.

106.   Specifically, NTA and/or SRM fabricated the John Smith Trucking Claim for the purpose of fraudulently concealing from Antares unfavorable

information, facts and/or evidence about the Cuevas Action.

107.   NTA and/or SRM also fabricated the John Smith Trucking Claim to fraudulently submit expenses to Antares for payment and/or reimbursement, many of which were not related to the Cuevas Action and/or were not proper expenses subject to reimbursement under the terms of the GAA and/or the Quota Share Agreement.

108.   NTA and/or SRM intended to induce Antares to refrain from acting on the concealed information, and further intended to induce Antares to make payments to NTA and/or SRM that were not subject to payment and/or reimbursement under the terms of the GAA and/or the Quota Share Agreement.

109.   Antares justifiably relied on SRM's and NTA's misrepresentations and has been damaged as a result thereof. Moreover, Antares seeks an award of punitive damages as a result of SRM's and NTA's fraud.

110.   Antares is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

## EIGHTH CAUSE OF ACTION

### Declaratory Relief

### (Antares v. NTA)

111.   Antares refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

112.   An actual, justiciable controversy within this Court's jurisdiction exists between Antares on the one hand and NTA on the other hand concerning the rights and obligations under the General Agency Agreement and the Quota Share Agreement. Based thereon, this Court has authority to issue a judgment for declaratory relief concerning the Parties' respective rights and duties.

113.   The Parties are adverse, Antares has a legally protectable interest in the controversy, and the issues are ripe for judicial determination. The requested judicial

determination is appropriate and necessary to resolve a present controversy by defining the respective rights and obligations of the Parties. No other adequate remedy exists by which the rights of the Parties may be determined.

114.　Based on the foregoing, Antares seeks a judicial determination and declaration that it is entitled to inspect and copy NTA's books and records as set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement; that NTA is required to remit the difference between its provisional commissions and the adjusted commissions for agreement years 2017 through 2019; and any other rights and obligations under the General Agency Agreement and the Quota Share Agreement.

## **PRAYER FOR RELIEF**

**WHEREFORE,** in light of the foregoing, Antares respectfully submits that judgment should be entered as follows:

1.　On the first cause of action, an order compelling specific performance of the requirements set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement;

2.　On the second cause of action, compensatory and general damages according to proof in a specific amount not yet ascertained, but in excess of the jurisdictional limit of this Court;

3.　On the third cause of action, compensatory general, and punitive damages according to proof in a specific amount not yet ascertained, but in excess of the jurisdictional limit of this Court;

4.　On the fourth cause of action, a mandatory injunction requiring NTA to comply with the requirements set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement

5.　On the fifth cause of action, an order compelling an

accounting with respect to NTA's obligations under Section 2.01 of the General Agency Agreement;

6.     On the sixth cause of action, compensatory, general, and punitive damages according to proof in a specific amount not yet ascertained, but in excess of the jurisdictional limit of this Court;

7.     On the seventh cause of action, compensatory, general, and punitive damages according to proof in a specific amount not yet ascertained, but in excess of the jurisdictional limit of this Court;

8.     On the eighth cause of action, a judicial declaration as to the parties' rights and obligations under the General Agency Agreement and the Quota Share Agreement;

9.     For costs of suit incurred herein;

10.     For attorneys' fees incurred herein; and

11.     For such other and further relief as the Court deems just and proper.

Dated:  January 10, 2023

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP


By: /s/Michelle R. Press
Michelle R. Press
Attorneys for Plaintiff Antares
Reinsurance Company Limited